GEORGE D. SWEETSER *et al.*

*v.*

CANUTE R. MATSON.

*Filed at Ottawa October 29, 1894.*

1. EXECUTION—*creditor postponing sale under execution loses priority.* An execution creditor who consents to postpone the sale under his execution from time to time, to allow the debtor to negotiate and settle with creditors, loses his priority as against an execution coming into the sheriff's hands pending such postponement.

2. SAME—*motive of postponement not material.* The fact that such postponement was prompted by kindness to the debtor, and was without intent to hinder and defraud creditors, and that the postponement did not, in fact, so hinder or defraud, does not preserve the priority of such execution.

*Matson* v. *Sweetser*, 50 Ill. App. 518, reversed.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. GEORGE H. KETTELLE, Judge, presiding.

This was an action on the case, brought by George D. Sweetser and others, co-partners, under the firm name of Sweetser, Pembrook & Co., against Canute R. Matson, sheriff of Cook county, to recover damages for a false return of an execution in favor of the plaintiffs and against the property of Fanton R. Lawlor. At the trial there was little, if any, controversy as to the material facts, those which the evidence tended to establish being, in substance, as follows :

On the 8th day of January, 1890, nine writs of execution against the property of Lawlor were issued and delivered to the defendant, as sheriff, to execute, viz., one from the Superior Court in favor of Nano Murphy, for $1765.67, and one from the same court in favor of E. W. Price, for $5160.60, and seven from the circuit court in favor of the Hibernian Banking Association, aggregating $28,732.03. On the same day, an attachment writ, in

favor of James H. Walker and against the property of
Lawlor, for $979.16, was also issued and placed in the
hands of the defendant, as sheriff, to execute.    These
nine executions and the writ of attachment were on the
same day levied by the defendant upon a stock of goods
at 182 and 184 Wabash avenue, Chicago, the value of
which, as shown by the invoice, was about $55,000, and
also upon a stock of goods on Blue Island avenue, which
was invoiced at something over $7000.    After making
these levies the defendant advertised the property levied
on for sale, the sale of the Wabash avenue stock of goods
to take place January 22, 1890, and the Blue Island ave-
nue stock one or two days later.

On the 17th day of January, 1890, Lawlor, the execu-
tion debtor, prepared and sent to each of his creditors
the following circular letter :

"CHICAGO, *January 17, 1890.*

"DEAR SIR—All my effects are now under seizure by
the sheriff, upon executions amounting to $41,800.    My
indebtedness outside of the judgments under which these
levies are made amounts to about $30,000.    Effects levied
upon are fairly and reasonably worth $80,000, and ought
to bring $70,000 if favorably disposed of.    It is thought
that if the sheriff makes sale under these levies, with the
usual and ordinary sacrifice attending a sheriff's sale, the
proceeds will fall short of satisfying the judgments, and
nothing will be left to apply on such other indebtedness.
On the other hand, it is hoped that if arrangements can
be made to dispose of the property levied upon by private
sale, enough can be realized, over and above the amount
of such judgments, to enable me to make a fairly good
payment upon my other liabilities.    To accomplish this
will require the consent of all my creditors, and it is to
obtain such consent I now write you:    The sheriff's sale
is advertised to commence the 22d inst., and to answer
any purpose I must hear from you immediately.    This

plan is the only one I can conceive by which something may be rescued for the non-judgment creditors. Please answer at once.            Yours truly,

To.....................                    F. R. LAWLOR."

With this letter Lawlor enclosed to each of his creditors a paper to be signed and returned, consenting to the sale or disposition of the property levied upon at private sale, by Lawlor and the parties in whose favor the levies were made, to the end that the largest sum possible should be realized therefrom. The evidence tends to show that this letter, before it was sent out, was shown to a representative of the execution creditors and approved by him. Before the end of January, Lawlor received favorable replies from eighty-seven out of a total of ninety-six of his creditors. Among those who refused to give the consent requested were the plaintiffs in this suit.

On January 22, 1890, the sale advertised for that day was, by the direction of the plaintiffs in the executions and with the consent of Lawlor, adjourned to January 29, 1890. On that day it was, by like direction and consent, adjourned to February 8, 1890. On February 5, 1890, the plaintiffs in this suit recovered a judgment against Lawlor for $1957.77, and on the same day an execution on their judgment was issued and placed in the hands of the defendant, as sheriff, with directions to levy upon the property of Lawlor and make the amount of the execution as soon as possible. On February 8, 1890, the sale was again adjourned by direction of the plaintiffs in the senior executions and consent of the execution debtor, but without the consent of the plaintiffs in this suit, to February 11, 1890. Between February 8 and 11 the sheriff was requested by the present plaintiffs not to postpone the sale any longer, and notified that they objected to any further postponement, but notwithstanding this the sheriff again postponed the sale, by direction of the plain-

tiffs in the senior executions, to February 13, 1890. The sale of the Blue Island avenue stock of goods was in like manner postponed from time to time, the day to which it was postponed being, in each case, a day or two later than that fixed for the sale of the Wabash avenue stock.

The scheme of having the property sold at private sale having failed to receive the unanimous consent of Lawlor's creditors, arrangements were made by the senior execution creditors for having the stocks of goods sold in bulk and not in parcels, Charles C. Lay being the prospective purchaser to whom it was proposed to have the sale made. With a view to this result, the following instrument was executed the day prior to that on which the sale finally took place :

"CHICAGO, *February 12, 1890.*

"We, the undersigned, judgment and lien creditors of Fanton R. Lawlor, hereby authorize and direct the sheriff of Cook county, Illinois, to sell in bulk, instead of in piecemeal or in parcels, all goods and stock of said Fanton R. Lawlor heretofore levied upon under executions now in the hands of said sheriff.

HIBERNIAN BANKING ASS.,

By J. V. CLARE, *Pres.,*

NANO MURPHY,

By DUNCAN & GILBERT, *her Att'ys,*

E. W. PRICE,

By DUNCAN & GILBERT, *his Att'ys,*

JAS. H. WALKER & CO.

"I hereby consent to the sale of all my stock of goods levied upon by the sheriff of Cook county, in bulk.

*Feb. 12, 1890.*                FANTON R. LAWLOR."

On the following day, and before the sale, the plaintiffs in the senior executions gave to the sheriff an indemnifying bond, in the penal sum of $50,000, which, after reciting that the plaintiffs in those writs had requested the sheriff to make sale of the goods levied upon in bulk, and were desirous that he should make sale of them in that

manner, was conditioned to hold him harmless from all actions, etc., to which he might be subjected by reason of selling the goods in bulk. On the same day the following instrument was executed by Charles C. Lay, the proposed purchaser at the sale, and the Hibernian Banking Association:

"CHICAGO, *February 13, 1889.*

"In consideration of the Hibernian Banking Association assigning to Charles C. Lay the following named judgments against F. C. Lawlor, to-wit: Hibernian Banking Association, $34,932.03; Murphy, $1765.67; Price, $5160.50,—amounting, together with $251.16 interest to date, to $42,109.36,—I, Charles C. Lay, hereby agree to pay to said association the sum of $37,109.36, less the amount to be received by said association from the sheriff of Cook county on account of the sale this day by said sheriff of the property in the Wabash avenue store of said Lawlor.

CHARLES C. LAY,
HAMILTON B. DOX,
*Cashier Hibernian Bank Ass.*"

There is no evidence tending to show that any of the several postponements of the sale of the goods levied upon were made for want of bidders, but the evidence tends to show that they were all made in furtherance of efforts on the part of the execution debtor, co-operated in by the plaintiffs in the senior executions, first, to obtain the unanimous consent of all the creditors of the execution debtor to a private sale of the goods, and, after that scheme was abandoned, to enable him to make arrangements for a purchaser who would bid off the two stocks of goods in bulk, and to have it so fixed that the sale should be made in that manner and not otherwise. The evidence also tends to show that the plaintiffs in this suit did not consent, but expressly objected to having the sales made in bulk.

On February 13, 1890, the Wabash avenue stock of goods was sold by the sheriff, without being previously offered in parcels, for $36,026, and on February 15 the Blue Island avenue stock was sold in the same manner for $6100, Charles C. Lay in both cases becoming the purchaser. The amount thus realized being a little less than sufficient to satisfy the senior executions, the execution in favor of the plaintiffs in this suit was returned wholly unsatisfied.

The defendant pleaded not guilty, and at the trial, which was had before the court, a jury having been waived, all propositions submitted on behalf of the plaintiffs, of which there were a considerable number, were held as the law in the decision of the case, and the court thereupon found the defendant guilty, and assessed the plaintiff's damages at $2313.22, and for that sum and costs the plaintiffs had judgment. On appeal to the Appellate Court the judgment was reversed, and a final judgment was entered by that court that the plaintiffs take nothing by their suit, and that the defendant go thereof without day, and also that the defendant recover of the plaintiffs his costs. In rendering this judgment the Appellate Court found the facts, and recited the same in its final order, as follows :

"*First*—That defendant, on February 5, 1890, was the sheriff of Cook county, Illinois, and on that day plaintiffs delivered to him the writ of *fieri facias* mentioned in the plaintiff's declaration, dated February 5, A. D. 1890, for the sum of $1957.77 and costs of suit, and against said Fanton R. Lawlor, and gave to the said defendant the instructions alleged in said declaration.

"*Second*—That prior to said February 5, A. D. 1890, and on the 8th day of January, A. D. 1890, one Nano Murphy had recovered in the Superior Court of said Cook county a judgment for $1765.67 and costs of suit, one E. W. Price had recovered in the same court a judgment for $5160.50 and costs of suit, and the Hibernian Banking Association

had recovered in the circuit court of said Cook county seven judgments, for $202.50, $2020.11, $7942.39, $3990.61, $9888.33, $4031.84 and $5031.25, and costs of suit, respectively, all of said judgments being against the said Fanton R. Lawlor, upon each of which said judgments a writ of *fieri facias,* in due form, had been duly issued out of and under the seal of the proper court, and delivered to the said defendant on the 8th day of January, A. D. 1890, and all of the said nine executions in favor of the said Nano Murphy, E. W. Price and the Hibernian Banking Association, for the respective sums above mentioned, were on said 8th day of January, A. D. 1890, duly levied by the defendant upon the goods and chattels mentioned in the plaintiff's declaration, contained in two separate stores, a mile distant from each other, which said goods and chattels were at usual invoice prices worth the sum of $62,000 to $65,000.

"*Third*—That the said defendant duly advertised to sell said goods and chattels pursuant to law, under said writs of *fieri facias* in favor of said Nano Murphy, said E. W. Price and the Hibernian Banking Association, on the 22d day of January, A. D. 1890, but postponed said sale, first, to the 29th day of January, A. D. 1890, again to the 8th day of February, A. D. 1890, again to the 11th day of February, A. D. 1890, and again to the 13th, and as to a part of said goods and chattels to the 15th day of February, A. D. 1890, on which two last mentioned dates said defendant, after duly advertising, sold said goods and chattels at public sale, to the highest bidder, selling the stock of goods in each store in bulk, as one lot, and realized, as the proceeds of the same, the sum of $42,000.

"*Fourth*—That said judgments and writs of *fieri facias* in favor of said Nano Murphy, E. W. Price and said Hibernian Banking Association were *bona fide,* and said writs of *fieri facias* were not taken out or used by the said Nano Murphy, E. W. Price or said Hibernian Banking Association, or either of them, or by the said defend-

ant, for the purpose of hindering, delaying or defraud-
ing any of the creditors of said Fanton R. Lawlor, and
although said postponements of said sale, as made by the
defendant, as aforesaid, were so made with the consent of
the said Fanton R. Lawlor, and at the request of the said
Nano Murphy, said E. W. Price and said Hibernian Bank-
ing Association, with the hope that Lawlor might make
some arrangement with his creditors and for his benefit,
said postponements were reasonable and proper, under
all the circumstances, and did not, in fact, in any manner
injure, delay, defraud or hinder, or tend to injure, delay,
defraud or hinder, the plaintiffs, or any other creditor or
creditors of the said Fanton R. Lawlor, in the collection
of their demands against him.

"*Fifth*—That at the time of the making of said sale of
said goods and chattels, as aforesaid, the said judgments
in favor of said Nano Murphy, said E. W. Price and said
Hibernian Banking Association were in full force and
effect, and there were due thereon the amounts, respect-
ively, for which said judgments had been rendered, to-
gether with interest, as provided by law.

"*Sixth*—That the defendant, in selling the same in two
lots or parcels, as aforesaid, acted in good faith, though
under the direction of and indemnified by the Hibernian
Banking Association, and obtained for said goods and
chattels as large a price as could or would have been
obtained had he divided said goods and chattels into
smaller lots or parcels, and the said plaintiffs suffered
no damage whatever by reason of said sale being made
in the manner aforesaid.

"*Seventh*—That the proceeds of said sale of said goods
and chattels, after deducting the legal costs and charges
of the defendant accruing from said levy and sale, were
insufficient to satisfy the writs of *fieri facias*, aforesaid, in
favor of said Nano Murphy, said E. W. Price and said
Hibernian Banking Association, and accordingly the de-
fendant applied said proceeds *pro rata* upon said writs

and returned the same in part unsatisfied; and there being none of said proceeds remaining to be applied upon the writ of *fieri facias* aforesaid, in favor of the plaintiffs, and the said defendant not having been able, by due diligence, to find any property of the said Fanton R. Lawlor out of which he, the said defendant, could make the amount of said writ of *fieri facias* in favor of the plaintiffs, or any portion thereof, duly returned said writ 'no part satisfied.'

"Wherefore this court doth now find the said defendant and appellant not guilty of the wrongs and injuries in the declaration of the plaintiffs and appellees set forth."

Messrs. WEIGLEY, BULKLEY & GRAY, for the plaintiffs in error:

The stay of execution sale, under the agreement between the parties, gave priority to plaintiffs in error's writ. Freeman on Executions, sec. 206; *Imray* v. *Magnay*, 11 M. & W. 267; Murfree on Sheriffs, sec. 536; *Warwall* v. *Young*, 5 B. & C. 660; *Rice* v. *Surgeon*, 7 Mod. 43; *Mentz* v. *Hammon*, 34 Am. Dec. 546; *Eberle* v. *Mayer*, 1 Rawle, 366; *Hickman* v. *Caldwell*, 4 id. 376; *Berry* v. *Smith*, 3 Wash. C. C. 60; *Ross* v. *Weber*, 26 Ill. 222; *Koven* v. *Roemheld*, 6 Ill. App. 275; *Baldwin* v. *Freydendall*, 10 id. 119; *Gilmore* v. *Davis*, 84 Ill. 487.

A complaint for a false return on execution need not allege deceit or fraud. It is enough if it is untrue. Smith on Sheriffs, 576; *Peebles* v. *Neson*, 74 N. C. 473; *Johnson* v. *Riley*, 59 How. Pr. 554.

The sale in bulk, by agreement of the parties, was not a legal sale, and the sheriff can not justify thereunder. Section 12, chapter 77, of the Revised Statutes, provides: "When real or personal property is taken in execution, if the same is susceptible of division it shall be sold in separate tracts, lots or articles, and only so much shall be sold as is necessary to satisfy the execution and costs." See, also, *Brodie* v. *Seegraves*, 3 N. C. 144; *Klopp* v. *Whilmeyer*, 43 Pa. St. 219; Freeman on Executions, sec. 297.

The sheriff having violated the law, can not justify under the illegal proceedings.    Freeman on Executions, sec. 302; *Knight* v. *Herrin*, 48 Me. 533; *Smith* v. *Gates*, 21 Pick. 55; *Pierce* v. *Benjamin*, 14 id. 356.

Messrs. DUNCAN & GILBERT, for the defendant in error:

A postponement of a sale must be such a postponement as to justify the inference that the plaintiff in the execution did not intend to compel a sale.    The senior execution creditors in the case at bar really intended to make their money.    *Wier* v. *Hale*, 5 W. & S. 285; *Thorne's case*, 2 Barr, 336; *Lants* v. *Worthington*, 4 Pa. St. 153; *Dancy* v. *Hubbs*, 71 N. C. 424.

We call the attention of the court to the following facts by way of summary:

*First*—There was in this case no actual fraud or intent to defraud.

*Second*—The adjournments of the sale could not, and did not in fact, injure the plaintiffs in error, because the sale was finally made before it could have been made had the property been advertised under their execution.

*Third*—The adjournments made in January, at Lawlor's request, were made for a legitimate purpose, to-wit, that of benefiting the plaintiffs in error and others, instead of injuring or defrauding them.

*Fourth*—The evidence does not show that any of the adjournments of the sale, made after the plaintiffs in error obtained their judgment, were made at the request of Lawlor.

*Fifth*—There is no proof tending to show that the various adjournments were unreasonable, and the presumption must be, in the absence of proof to the contrary, that the officer acted in strict accordance with law.

*Sixth*—The plaintiffs in error having failed to show any fraudulent intent, or to show any injury, or any conduct calculated to hinder or delay them in the collection of

their debt, are not entitled to recover by reason of the adjournments of the sale.

Judging the case by its own circumstances, as suggested in *Everingham* v. *Nat. City Bank*, 124 Ill. 595, there is nothing in the evidence that will furnish any just reason for depriving the senior execution creditors of the benefit of their prior lien.

Mr. JUSTICE BAILEY delivered the opinion of the court:

The eighty-seventh section of the statute in relation to practice in courts of record provides, that when any final determination shall be made by the Appellate Court, as the result, wholly or in part, of a finding of the facts concerning the matter in controversy different from the finding of the court from which the cause was brought by appeal or writ of error, it shall be the duty of the Appellate Court to recite in its final order, judgment or decree the facts so found, and the judgment of the Appellate Court shall be final and conclusive as to all matters of fact in controversy in such cause. In this case the Appellate Court has found the facts upon which its judgment is based, and has recited those facts in its final judgment, and it is insisted that recital is conclusive in this court as to all the facts in the case.

It is urged, however, with much earnestness, that the section of the statute here referred to is not applicable to this case, for the reason that there was not, either in the Appellate Court or in the trial court, any substantial controversy as to the material facts, and that the judgment of the Appellate Court, therefore, was not, and could not have been, the result, either wholly or in part, of any finding of facts different from the finding of the trial court, but only of a difference of opinion between the two courts as to the legal consequences of facts about which there was really no controversy.

It must be admitted that the power of the Appellate Court to find and recite the facts in such way as to make

its recital the exclusive evidence of what the facts in controversy are, is purely statutory, and can be exercised only in those cases to which the statute applies, and there seems to be much reason for the contention that where the facts are not really in controversy there can be no occasion for the Appellate Court to find and recite them in its final judgment. In such case, its determination can not, in the nature of things, result from a difference between its finding and that of the trial court as to the facts, and consequently no case is presented which is within either the letter or intention of the statute.

It is urged in this case that the practical objection to accepting the recital of facts found in the final judgment of the Appellate Court, instead of taking them as they appear in the record of the trial court, arises, not so much from any inaccuracy in the recitals of the Appellate Court, so far as they go, as from the omission, as the plaintiffs insist, of various material and undisputed facts which appeared before the trial court. If, then, the findings of the Appellate Court are to be taken as the final, plenary and conclusive recital of all the facts in the case, it is insisted that the plaintiffs will now be deprived of the benefit of the omitted facts, though proved at the trial and not controverted.

But while we are disposed to think that there is much force in the contention, we are inclined to base our decision solely upon the facts as recited in the judgment of the Appellate Court. It appears from that recital that the nine executions in favor of the Hibernian Banking Association, Nano Murphy and E. W. Price were placed in the hands of the defendant, as sheriff, January 8, 1890; that on the same day the defendant levied those executions upon the two stocks of goods in question; that he advertised the same for sale on January 22, 1890, but postponed the sale to January 29, and again to February 8, and again to February 11, and finally to February 13, at which last mentioned date the Wabash avenue stock

of goods was sold, the Blue Island avenue stock being sold, after similar postponements, on February 15. It is further recited, in substance, that these several postponements of the sales were made, as aforesaid, by the defendant, with the consent of the execution debtor, and at the request of the plaintiffs in the executions, with the hope that the execution debtor might make some arrangements with his creditors and for his benefit.

On the fifth day of February, which was pending the postponement from January 29 to February 8, the execution of the plaintiffs in this suit came into the hands of the defendant, as sheriff, and the question is, whether at that date the senior executions were, or thereafter became, as against the junior execution, dormant, so as to give to the junior execution priority of lien.

The theory upon which it is claimed that the senior executions became dormant is, that the several postponements of the sale, made, as they were, at the request of the execution creditors, for the benefit of the execution debtor, and for the purpose of aiding him in making some arrangement with his creditors, constituted an employment of the writs for an object inconsistent with their nature, and were such a perversion of them from their legitimate purpose as rendered them fraudulent and void as against other creditors.

It is true the Appellate Court found, as a matter of fact, that the senior executions were not taken out or used by the plaintiffs therein, or by the sheriff, for the purpose of hindering, delaying or defrauding any of the creditors of the execution debtor, and that the postponements of the sale were reasonable and proper, under the circumstances, and did not, in fact, in any manner injure or tend to injure, delay, defraud or hinder the plaintiffs in the junior execution, or any other creditor of the execution debtor, in the collection of their demands against him. If the present case is one in which the Appellate Court was required by the statute to find the facts and

recite the same in its final judgment, it must, of course, be conceded that this finding is conclusive that in the several postponements of the sale there was no fraud in fact,—that is to say, there was no actual intention on the part of the plaintiffs in the senior executions, or of the sheriff, to hinder, delay or defraud other creditors,— and that the postponements of the sale did not, in fact, have that effect. But it is clear that the finding of the Appellate Court upon the question whether the use made of the executions was fraudulent can be given no effect beyond this. Whether there was fraud in law,—that is to say, whether fraud resulted, as a legal consequence or conclusion, from the postponements of the sale, made in the manner and for the purposes above stated,—is a legal question, in respect to which the findings of the Appellate Court can have no binding effect in this court.

Does the law, then, from the facts as found, imply such fraud as must be held to be sufficient to postpone the senior executions to the lien of the junior creditors? The general doctrine applicable to this subject is stated by Freeman in his treatise on Executions, as follows: "An execution and its lien may be avoided by such conduct on the part of the plaintiff as shows an improper use of his writ, though the motives influencing such conduct, instead of being fraudulent, were grounded in kindness and charity toward the defendant, and free from the slightest design to injure others. The only proper use of an execution is to enforce the collection of a debt, and to enforce it with a considerable degree of diligence. To employ it for other objects is inconsistent with its nature, and such a perversion from its legitimate purposes as brings upon it the penalty prescribed by the statute of Elizabeth. The plaintiff in execution may desire to allow the defendant time in which to make payment, and yet may wish to save himself from all hazard arising from his delay to enforce collection of his judgment. He is likely, therefore, to take out execution with a view of

binding defendant's property, but with no intent to make any immediate levy or sale,—in other words, he seeks to convert an execution into a mere mortgage. This the law will not tolerate." (1 Freeman on Executions, sec. 206.) And again: "The lien of an execution is designed to assist the plaintiff while he is seeking to enforce the writ. If at any time he is shown not to be seeking such enforcement, then, during such time, he is without any execution lien, and is liable to lose the benefit of his writ through the sale or incumbrance of the defendant's property or by the operation of a junior writ. He can not avoid this result by showing that his intentions were meritorious, or that he knew of no other creditors. Whenever, by the plaintiff's orders, or by agreement between him and the defendant, the execution of the writ is suspended, by directions not to levy, or, after levy, by directions not to sell, whether such directions are permanent in their nature or designed to operate only until further orders are given, then, according to the decided preponderance of the authorities, the lien is also suspended, and the execution becomes dormant." Ibid.

In *Gilmore* v. *Davis*, 84 Ill. 487, this court stated the rule as follows: "We believe the doctrine to be, as the object of an execution is to obtain satisfaction of the judgment on which it issues, on its delivery to the proper officer it gives to the creditor a priority, because the law imposes the duty upon the officer to execute it without delay. Any act of the creditor, therefore, diverting the execution from this purpose, renders it inoperative against other creditors, and clothes them with priority." In that case an execution was placed in the hands of the officer with instructions not to levy until further orders, and it was held to be subordinate to another execution afterwards issued to the officer with instructions to proceed at once. In *Ross* v. *Weber*, 26 Ill. 221, a judgment creditor entered into an agreement with his debtor to stay his execution, and it was held that the execution

thereby became dormant, and that the creditor lost the lien acquired by his levy.

But an execution does not become dormant or fraudulent by the mere indulgence or negligence of the sheriff. "The concurrence of the plaintiff is necessary to produce that result, and if the delay in proceeding under an execution arises from the orders of the party by whom it has been issued, or from collusion with him, such delay will render the execution fraudulent and void as against all other creditors of the defendant." Murfree on Sheriffs, sec. 536. See, also, *Eberle* v. *Mayer*, 1 Rawle, 366 ; *Commonwealth* v. *Stremback*, 3 id. 341; *Hickman* v. *Caldwell*, 4 id. 376 ; *Kellogg* v. *Griffin*, 17 Johns. 274; *Berry* v. *Smith*, 3 Wash. C. C. 60 ; *Korem* v. *Roemhold*, 6 Ill. App. 275 ; *Baldwin* v. *Freydendall*, 10 id. 106.

The application of these rules to the present case must result, we think, in the conclusion that, at the time the junior execution was placed in the hands of the sheriff, the senior executions were dormant, so as to give priority to the junior writ. The postponements of the sale from time to time do not seem to have been made by the sheriff for want of bidders, nor in the exercise by him of the discretion which the law vested in him in matters of that character, but they were all made as the result of the interference by the creditors in the due execution of their writs, and at their express request, and for objects inconsistent with the nature and purposes of the writs. On that subject, as we have already seen, the Appellate Court found the fact to be, that all these postponements of the sale were made by the sheriff at the request of the plaintiffs in the executions, and for the benefit of the execution debtor, and with the hope that the debtor might make some arrangement with his creditors.

That such use of the writs constituted a perversion of them from their legitimate purposes seems to us too plain to admit of serious doubt. Action under them was postponed from time to time, for the mere purpose of giving

the debtor an opportunity to negotiate with his other creditors in such way as to secure from them some compromise or other advantage. This manifestly was not a purpose for which the writs could be legitimately used.

It matters not that the creditors were actuated by motives of kindness or leniency to their debtor, or that they had no actual intention to hinder or defraud other creditors, nor is it a controlling circumstance that the various postponements of the sale did not, as a matter of fact, hinder, delay or defraud other creditors. Fraud arises from such abuse of the writs as a legal conclusion, and the consequence which the law imposes is, to give to a junior execution coming into the hands of the sheriff during the pendency of such postponements, a preference over the writs used for such fraudulent purpose.

The senior creditors having thus lost their priority, the sheriff, in distributing the proceeds of the sale of the goods, should have satisfied the junior execution first, and sufficient money having been realized to more than satisfy that execution, his return that he could find no property of the execution debtor with which to satisfy it was a false return, which entitled the plaintiffs therein to recover from him the amount of their judgment and costs.

We are of the opinion, therefore, that the judgment of the Superior Court was justified by the facts, and the judgment of the Appellate Court will accordingly be reversed and the judgment of the Superior Court will be affirmed.

*Judgment reversed.*